# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JULIO CRUZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 11-40054-FDS |
| ) | |
| MICHAEL ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER ON
## PLAINTIFF'S MOTION TO REVERSE AND DEFENDANT'S
## MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

This is an appeal of the final decision of the Commissioner of the Social Security Administration denying an application for social security disability insurance ("SSDI") and supplemental security income ("SSI") benefits. Plaintiff contends that the administrative law judge ("ALJ") erred in finding that he was not disabled.

Pending before the Court is plaintiff's motion to reverse and the Commissioner's motion to affirm. For the reasons stated below, the motion to affirm will be granted and the motion to reverse will be denied.

**I.      Background**

Julio Cruz is a 39-year-old high school graduate. (Administrative Record at 25). He has previously worked as a dispatcher and a material handler. (*Id.* at 50). He has had asthma since

he was 15, but it has worsened since 2009. (*Id.* at 40-41). He began suffering from depression around January 2008 after discovering his wife was having an affair; they eventually divorced. (*Id.* at 27-31). He met another woman in March 2008, and they married in February 2010. He has not worked since the alleged date of the onset of his disability, which is March 3, 2008.

### A. Medical History

Cruz testified that he had been seeing a psychiatrist and receiving medication as early as January 2008.[1] (*Id.* at 27-29). In June 2008, he was seen at West Bay Psychiatric Associates. He was referred there by his primary care physician, Dr. Frank LaFazia. (*Id.* at 249). Dr. LaFazia's notes also reflect that Cruz suffered from asthma, initial insomnia, and frequent waking. (*Id.* at 250-52). At West Bay, Brian A. Hickey, a clinical nurse specialist, diagnosed major depression and social anxiety and prescribed Lexapro, Ambien, Xanax, and Wellbutrin. (*Id.* at 242). At a follow-up visit in July 2008, Cruz told Dr. Charles Denby, a psychiatrist, that he did not think he was doing better, but others around him did. Dr. Denby's notes indicate that Cruz had improved and needed more time on Wellbutrin.

In a September 2008 visit, Dr. Denby noted that Cruz exhibited depressive syndrome and changed his medication. (*Id.* at 245). In October 2008, Cruz told Dr. Denby that he had been okay until he found out that his children would not be spending the weekend with him and that he had good days and bad days. (*Id.* at 244). At a visit in November 2008, Cruz indicated that he was "doing ok," and might be able to return to work. (*Id.* at 243). Dr. Denby also recommended that he start seeing a therapist. (*Id.*).

On January 26, 2009, Dr. Ginette Langer, Ph.D., a psychiatrist from Massachusetts

---

[1] The administrative record does not contain medical records before June 2008.

Disability Determination Services ("DDS"), completed a Psychiatric Review Technique Form as to Cruz. (*Id.* at 258-71). She determined that Cruz suffered from depressive syndrome characterized by sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulties concentrating or thinking. (*Id.*). The evaluation stated that he had mild restrictions with activities of daily living and maintaining social functioning; moderate restrictions in maintaining concentration, persistence, and pace; and no episodes of decompensation. (*Id.*).

Dr. Langer also completed a mental residual functional capacity ("RFC") assessment. The RFC stated he was moderately limited in his ability to maintain attention and concentration, complete a normal work week without interruptions from psychological symptoms, and interact appropriately with the public and respond to changes in the work setting. (*Id.* at 272-73). Dr. Langer concluded that Cruz did not suffer from any significant limitations, that he would be able to concentrate and maintain attention for at least two-hour periods, and that he could be socially appropriate and adapt to routine work-setting changes. (*Id.* at 274).

In April 2009, Dr. Ronald Maclin filed documentation with DDS as Cruz's primary-care physician. Dr. Maclin indicated that Cruz suffered from mild essential hypertension and moderate asthma, both of which were under control. (*Id.* at 278). The documentation did not list any severe episodes of asthma. (*Id.* at 282). Dr. Maclin also indicated that Cruz had no psychiatric history, and listed no significant mental or emotional problems. (*Id.* at 283).

In May 2009, Dr. Malin Weeratne reviewed Cruz's medical records for DDS. (*Id.* at 284). Dr. Weeratne reported that Cruz was independent, required no assistive devices, and had no problems with daily activities. (*Id.*). Dr. Weeratne also noted that he had controlled asthma and hypertension, but no exacerbations on record or target organ damage, based on Dr. Maclin's

3

reports. (*Id.*).

In September 2009, Eva Snyder, a licensed clinical psychologist, conducted an consultative examination of Cruz on behalf of DDS. (*Id.* at 285-90). She found that he was depressed, with feelings of worthlessness, and suffered from sleep disturbances and decreased energy. (*Id.* at 288). She also determined that he could take care of himself and function well in his home environment. (*Id.*). Her report concluded that he needed counseling. (*Id.*). His global assessment of functioning (GAF) score was 62-65. (*Id.* at 289).[2]

On August 18, 2009, Cruz reported to the emergency department at Harrington Memorial Hospital. The doctor diagnosed difficulty breathing and asthma exacerbation that was moderate at worst. (*Id.* at 345-51). He was given prednisone and discharged. (*Id.*). On January 23, 2010, he again went to the emergency department at the hospital with trouble breathing. He was again given prednisone and discharged. (*Id.* at 322-27).

On February 6, 2010, Cruz was taken by ambulance to the emergency department at Harrington Hospital with severe respiratory distress. (*Id.* at 307-21). He was unresponsive and in severe distress, and was intubated immediately. (*Id.*). He was discharged two days later. (*Id.*). On March 27, 2010, he again went to the emergency department because he was having difficulty breathing. (*Id.* at 302-06). The attending physician noted that the symptoms were continuous but the severity was moderate. He was given albuterol and prednisone and

---

[2] A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school situations, but general functioning and the existence of some meaningful personal relationships. A score between 51 and 60 indicates that the individual has moderate symptoms or moderate difficulty in social, occupational, or school situations. *See Petrie v. Astrue*, 412 Fed. Appx. 401, 406 n.2 (2nd Cir. 2011) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 376–77 (4th ed., text revision, 2000)). "A GAF score of 41–50 indicates an individual has serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Rios v. Comm'r of Soc. Sec.*, 2011 WL 4059780 (3rd Cir. Sept. 14, 2011).

discharged.  (*Id.*).  On April 16, 2010, Cruz again was brought to the emergency department because he was shaking and having an anxiety attack.  (*Id.* at 297-301).  He was given Xanax, which reduced his anxiety, and was discharged shortly afterwards.  (*Id.*).

Shortly after the February 2010 hospitalization, Dr. Vladas Litani, a pulmonologist, examined Cruz after a referral from his primary-care provider, Dr. Alvin Chua.  (*Id.* at 294-95).  Dr. Litani found that Cruz suffered from severe, persistent bronchial asthma; obstructive sleep apnea; and allergic rhinitis.  (*Id.*).  Dr. Litani suspected that he had multiple environmental allergies, including an allergy to his dog, and determined that he needed a higher dose of inhaled steroids.  (*Id.*).  In May 2010, Dr. Litani wrote a letter stating that Cruz would require the care of a pulmonologist for the rest of his life.  (*Id.* at 369).  In July 2010, Dr. Litani began giving him Xolair injections for asthma prevention.  (*Id.* at 368).

In May 2010, Cruz met with Dr. Asma Islam, a new primary-care physician.  Dr. Islam noted that his depression symptoms had not improved with medication and that he suffered from frequent wheezing with asthma exacerbations.  (*Id.* at 406-08).  He also reported to Dr. Islam that his asthma had previously been mild, but that it has worsened since moving to a new apartment in October 2009.  (*Id.*).  He stated that he was trying to move again because his current apartment had mold that could be exacerbating his asthma.  (*Id.*).

From April to July 2010, Cruz received counseling at You, Inc. Family Health Services.  (*Id.* at 374-83).  He met with Albert Otoo-Annan, a counselor, eight times and Samuel Young twice.  (*Id.*).  The discussions generally involved Cruz's relationship with his ex-wife and coping techniques and strategies to deal with stress and anxiety.  (*Id.*).  He was initially given a GAF score of 40, but on his July 8, 2010 visit, his GAF score was changed to a 60.  (*Id.*).

5

On August 10, 2010, Samuel Young completed a Psychiatric Review Technique Form as to Cruz that he submitted to DDS. (*Id.* at 385-97). Young reported that Cruz suffered from both affective (depressive) and anxiety-related disorders. The report stated that he had marked limitations in both activities of daily living and maintaining social functioning. (*Id.*).

On August 13, 2010, Dr. Litani completed a RFC questionnaire on Cruz. Dr. Litani listed a diagnosis as severe and persistent asthma. (*Id.* at 399-403). The questionnaire indicated that Cruz would be able to sit for up to four hours and stand or walk for two hours during an eight-hour workday, and lift 20 pounds occasionally and 10 pounds frequently. (*Id.*). It also stated that he should avoid all exposure to high humidity, fumes, odors, dusts, and gases, and avoid even moderate exposure to extreme cold or heat and wetness. (*Id.*).

### B. **Procedural Background**

On October 7, 2008, Cruz applied for Social Security disability benefits. (*Id.* at 10). He filed for supplemental security income on October 28, 2008. (*Id.*). Both applications listed the onset of disability date as March 3, 2008. (*Id.*). The applications were denied initially on January 30, 2009, and upon reconsideration on September 21, 2009. (*Id.*). On October 4, 2009, Cruz requested a hearing, which was held on September 14, 2010. (*Id.*). Cruz was represented by counsel at the hearing. (*Id.* at 22). Both Cruz and a vocational expert testified at the hearing. (*Id.*). On October 20, 2010, the ALJ issued a decision finding that he was not disabled. (*Id.* at 7).

The Decision Review Board selected the decision for review. (*Id.*). Cruz's counsel filed a written statement with the Decision Review Board objecting to several of the ALJ's findings. (*Id.* at 4-5). Cruz's counsel argued that the ALJ's determination of Cruz's RFC was incorrect

6

because the ALJ failed to treat Dr. Litani as a treating physician, incorrectly found that Samuel Young was not an acceptable medical source, did not give adequate reasons for not finding Cruz's testimony credible, and failed to follow regulations regarding mental limitations. (*Id.*). Cruz's counsel also contended that the ALJ failed to follow regulations and was incorrect in finding that jobs existed that Cruz was capable of performing. (*Id.*). The Decision Review Board did not take action within 90 days, making the ALJ's decision final. (*Id.* at 1). On March 14, 2011, Cruz filed this complaint.

## III. Analysis

### A. Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The Commissioner's factual findings, "if supported by substantial evidence, shall be conclusive," 42 U.S.C. § 405(g), because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ. It does not fall on the reviewing court." *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001) (citation omitted); *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (noting that the court "must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence"). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Questions of law, to the extent that they are at issue in the appeal, are reviewed *de novo*. *Seavey*, 276 F.3d at 9.

7

**B.     Standard for Entitlement to SSDI and SSI Benefits**

An individual is not entitled to SSDI or SSI benefits unless he or she is "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423(a)(1), (d) (setting forth the definition of disabled in the context of SSDI); *id.* §§ 1382(a)(1), 1382c(a)(3) (same in the context of SSI). "Disability" is defined, in relevant part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be severe enough to prevent the plaintiff from performing not only past work, but any substantial gainful work existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[3] "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the

---

[3] "All five steps are not applied to every applicant, as the determination may be concluded at any step along the process." *Seavey*, 276 F.3d at 5.

Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At that juncture, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

      C.      **The Administrative Law Judge's Findings**

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4).

At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since March 3, 2008, the alleged onset date of his disability. (AR at 12).

At the second step, the ALJ found plaintiff's asthma and affective disorder to be severe impairments. (*Id*.). The ALJ determined that plaintiff met the following limitations of the paragraph "B" criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1: mild restriction of activities of daily living; moderate restriction in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration. (*Id.* at 13). The ALJ did not find that plaintiff met any paragraph "C" limitations. (*Id*.).

At the third step, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*).

At the fourth step, the ALJ found that plaintiff's RFC allowed him to perform a reduced

9

range of light work. (*Id.*). Plaintiff could stand or walk for four hours per eight-hour day, occasionally climb and crouch, and occasionally push or pull with his upper extremities. (*Id.*). He should avoid exposure to extreme temperatures, humidity, hazards, and fumes. (*Id.*). He should not be subjected to "rate, pace" production work and he possessed moderately limited social functioning. (*Id.*). Given this RFC, the ALJ found him incapable of performing his past relevant work as he performed it and as it is generally performed nationally. (*Id.* at 15).

At the fifth step, the ALJ found that given plaintiff's RFC, age, education, and work experience, there were jobs that exist in significant numbers in the national economy that he could perform. (*Id.*). The ALJ consequently made a finding that plaintiff was not disabled. (*Id.* at 16).

Plaintiff has filed a *pro se* brief that simply contends that he was wrongfully denied benefits. He does not clearly contest any specific factual or legal findings by the ALJ. The ALJ's decision will therefore be reviewed to determine if it is supported by substantial evidence.[4]

As an initial matter, plaintiff's brief argues that he also suffers from side effects of his medications, including weight gain, drowsiness, and insomnia. That issue is raised for the first time in this Court. An issue that has not been raised before in Social Security Administration administrative proceedings is not generally reviewable by the District Court. *See Wheeler v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986). A plaintiff bears the burden of providing evidence to demonstrate the severity of the claimed condition. *See McDonald v. Sec'y of Health*

---

[4] This Court will also consider the objections raised by Cruz's counsel in the written statement to the Decision Review Board to the extent that they have merit.

*& Human Servs.*, 795 F.2d 1118, 1122 (1st Cir. 1986). To the extent that plaintiff may be attempting to raise new issues, they will not be considered.

D.     **Dr. Litani's Evaluation**

The ALJ gave some credit to the limitations proposed by Dr. Litani, while finding other limitations unsupported by the evidence, particularly sitting limitations and the severity of plaintiff's asthma. A treating physician's opinion may be given controlling weight if the ALJ finds that it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527, 416.927. Opinions that are not given controlling weight are valued based on the length, nature, and extent of the treatment relationship, support from medical evidence, consistency of the opinion, specialization of the doctor, and any other relevant factors. *Id.*

The ALJ found that Dr. Litani's limits were not supported by substantial evidence and were not entitled to controlling weight. The ALJ noted that there was no evidence in the record to support any limitation on sitting suggested by Dr. Litani, and that plaintiff's entire medical record, including notes from Dr. Maclin and Dr. Islam, generally indicated that his asthma was largely under control, despite some exacerbations. (AR at 278, 406). Furthermore, the ALJ also gave less weight to Dr. Litani's report because he had served only as a consulting physician for about six months when he wrote the report and therefore could not accurately comment on plaintiff's full history since the alleged onset date of disability in March 2008. (*Id.* at 14).

The ALJ properly considered relevant factors in discounting Dr. Litani's opinions, including the length and nature of the relationship, as well as support from other medical evidence. The ALJ did not err in limiting the weight given to Dr. Litani's evaluation.

11

E.  **Acceptable Medical Sources**

The ALJ did not give significant weight to the assessment by Samuel Young, deeming him not to be an acceptable medical source. Acceptable medical sources for the purposes of establishing a medically determinable impairment include licensed physicians and licensed or certified psychologists. *See* 20 C.F.R. §§ 404.1513, 416.913. Other sources of evidence may also be used, such as social welfare agency personnel, or other unlisted medical sources, including therapists. *Id.* A clinician is not an acceptable medical source and is treated as another source of evidence. *See Sewasky v. Astrue*, 2011 WL 3204361 at *3 (C.D. Cal. July 26, 2011); *Rector v. Astrue*, 2011 WL 1486607 at *3 (N.D. Okla. April 19, 2011).

Young's exact qualifications are unclear from the record. On the reports from You, Inc., Family Health Services, Young as listed as a clinician with no indication of a degree or license. (AR at 373-83). In the Psychiatric Review Technique Form that Young completed, he wrote his name in the "physician/examiner" field. (*Id.* at 385). In the decision, the ALJ referred to him as a clinician. (*Id.* at 15). At the hearing, plaintiff's attorney referred to him as Dr. Young, while in the cover sheet submitting the Psychiatric Review Technique Form as evidence, he is referred to as a clinician. (*Id.* at 52). In the written statement to the Decision Review Board, plaintiff's attorney objected to the ALJ's determination that Young is not a acceptable medical source, but does not indicate what Young's qualifications are that would make him an acceptable medical source. (*Id.* at 4).

While there is some ambiguity in the record, the ALJ's determination that Young was not

an acceptable medical source is supported by substantial evidence.[5] The ALJ's decision not to give significant weight to Young's assessment was therefore supported by substantial evidence, and will not be reversed.

### F. Plaintiff's Credibility

The ALJ also considered plaintiff's testimony regarding limitations imposed by his asthma, depression, and anxiety, but did not give it substantial weight. As a general matter, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated h[is] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference. . . ." *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) (citing *DaRose v. Sec'y of Health & Human Servs.*, 803 F. 2d 24, 26 (1st Cir. 1986)). However, the ALJ "must make specific findings as to the relevant evidence he considered in determining to disbelieve" the plaintiff. *Da Rosa v. Sec'y of Health and Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986).

Alleged functional limitations and restrictions due to symptoms must be reasonably consistent with medical evidence and other evidence, including statements and reports by the claimant and treating sources. 20 C.F.R. §§ 404.1529, 416.929. Factors considered in assessing the severity of symptoms include daily activities; location, duration, frequency, and intensity of symptoms; type, dosage, effectiveness, and side effects of medication; and treatment or any other measures used to relieve symptoms. *Id.*; *see also Avery v. Sec'y of Health and Human Servs.*,

---

[5] Furthermore, even if Young were an acceptable medical source, the ALJ's decision would still be supported by substantial evidence. The ALJ also chose not to give significant weight to Young's assessment because it was inconsistent with the medical record and plaintiff's statements. Although Young indicated plaintiff has marked limitations in activities of daily living and social functioning, the ALJ found that to be inaccurate, based on treatment notes that stated plaintiff could handle daily living and interact with his children and others. (*Id.* at 14).

797 F.2d 19, 29 (1st Cir. 1986). An ALJ is not required to discuss specifically all these factors in making a decision. *Deforge v. Astrue*, 2010 WL 3522464, at *9 (D. Mass. Sept. 9, 2010).

In declining to find that plaintiff's reports of difficulty in social interactions were credible, the ALJ considered mental health assessments that reported steady improvement and high GAF scores. (AR at 15). The ALJ also found that although plaintiff may have some social limitations, he had demonstrated the ability to interact appropriately with his new wife, who he met in March 2008 and married in February 2010, his children, and his medical examiners. (*Id.*). He was also able to manage his activities of daily living. (*Id.*). Because medical evidence did not fully support plaintiff's claims regarding his mental health, the ALJ's decision to give the claims limited weight was proper.

The ALJ also rejected the extent of the limitations imposed by asthma that plaintiff had claimed, finding that they lacked objective support. Although plaintiff had several recent trips to the emergency room, much of the medical evidence indicated that the asthma did not impose severe limitations. The ALJ noted that he had only started seeing a pulmonologist recently, and previous reports indicated that the asthma was well-controlled. (*Id.* at 14). Therefore, the ALJ's decision to discount the credibility of plaintiff's testimony regarding the limitations imposed by his asthma, anxiety, and depression was supported by substantial evidence.

### G. Finding of Disability

After determining the limits imposed by plaintiff's impairments, the ALJ made a finding that plaintiff was not disabled. The vocational expert testified that based on plaintiff's age, education, past work experience, and RFC, there were jobs that existed in substantial numbers in both the national and local economy that he could perform. (*Id.* at 49-52). The vocational expert

14

stated that although plaintiff could not perform his past work, he could still work as a cashier or a ticket seller, and they were consistent with the Dictionary of Occupational Titles. (*Id.*); *see* 20 C.F.R. 404.1569. The ALJ's finding that plaintiff was not disabled and he was able to perform certain jobs with his RFC is therefore supported by substantial evidence.

## III. Conclusion

For the foregoing reasons, plaintiff's motion to reverse the decision of the Commissioner is DENIED, and the Commissioner's motion to affirm is GRANTED.

**So Ordered.**

        /s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: January 24, 2012